**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Floyd R. Gill, Jr., | : | Case No. 3:08 CV 01572 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security, | : | **MEMORANDUM DECISION AND ORDER** |
| Defendant. | : | |
| | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of Defendant's final determination denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U.S.C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act , 42 U.S.C. §§ 1381 *et seq*. Pending are the parties' Briefs on the Merits and Plaintiff's Reply (Docket Nos. 13, 18 and 19). For the following reasons, the Commissioner's decision is remanded pursuant to sentence four of 42 U. S. C. § 405(g).

## I.  PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB on November 22, 1999, alleging disability since June 20, 1999 (Tr. 76-78). On March 27, 2000, Plaintiff filed an application for SSI benefits (Tr. 267-272). Plaintiff's

applications were denied initially and upon reconsideration (Tr. 60-63, 66-68, 274-277).  On June 8, 2001,

Plaintiff, represented by counsel and Dr. Joseph C. Havranek, a Vocational Expert (VE), appeared and

testified at a hearing conducted by Administrative Law Judge (ALJ) Bryan J. Bernstein (Tr. 288).  On May

20, 2002, the ALJ found that (1) Plaintiff was not entitled to a period of disability and DIB and (2) Plaintiff

was not eligible for SSI (Tr. 285-287).

The Appeals Council vacated the ALJ's decision and issued an Order Remanding Case to the ALJ

on March 28, 2003 (Tr. 313-316).  On remand, Plaintiff's application was consolidated and incorporated

with the application for DIB filed on October 25, 2002.  A hearing was held before the ALJ on June 15,

2004 (Tr. 26).  On February 2, 2006, the ALJ again issued an unfavorable decision denying benefits (Tr.

23-38).  The Appeals Council denied Plaintiff's request for review, upholding the ALJ's denial of benefits

(Tr. 11-13).  Plaintiff filed a timely request for judicial review in the United States District Court for the

Northern District of Ohio, Western Division.

## II.  FACTUAL BACKGROUND

**1.      The June 8, 2001, Hearing**.

      **A.      Plaintiff's Testimony**.

Plaintiff was 6'1" tall and weighed 195 pounds.  He recently lost 35 pounds by eating less food (Tr.

740, 759-760).  Plaintiff was attempting to regain legal custody of his 13 year old daughter who currently

lived with him and his wife of eleven years (Tr. 740, 750).  His wife was bipolar and had been approved

recently for Social Security benefits (Tr. 737, 759).

Plaintiff, a high school graduate, worked part-time at Whirlpool for a couple of months in 1986 (Tr.

743, 744).  From January 26, 1987 to June 20, 1999, Plaintiff was employed full-time as a production

operator (Tr. 742).  Plaintiff explained that he could not work now because of "spells of fatigue" and uncontrolled twitches (Tr. 758).

Plaintiff had been involved in two automobile accidents (Tr. 736).  The first occurred in October 1998 and the second in September 2000 (Tr. 140, 569).  Plaintiff returned to work but was absent frequently.  By June 1999, Plaintiff stopped work and later began experiencing financial problems (Tr. 744).  Unable to comply with the terms of a land contract, Plaintiff sublet his house and moved with his wife into a heated camper from approximately June 2000 to April 2001 (Tr. 736). Subsequently,  Plaintiff  moved back into his house (Tr. 739).

Plaintiff had arthroscopic surgery on his right knee, an umbilical/hiatal hernia with acid reflux, breathing difficulty, fibromyalgia, myoclonus, a sleeping disorder, headaches and body pain including pain in the ankle, shoulder blade, back and neck (Tr. 746, 747, 748, 749, 750-751, 753, 754, 755, 756, 761, 765).  He was taking medications used to treat various types of seizures, provide heartburn relief and offer pain relief (Tr. 751, 753, 756).  He was also given certain exercises to do to relieve pain (Tr. 766).  Over the past several years, Plaintiff had been treated for episodes of depression, anxiety and suicidal ideations (Tr. 770).  Plaintiff had episodes of extreme anger and psychotic aggression.  He was hospitalized for an addiction to Xanax (Tr. 770-771).

Occasionally, Plaintiff would play ball with his daughter.  The bending, standing, squatting, turning and twisting aggravated the pain throughout his body (Tr. 765).  He could, however, lift a gallon of milk with his right arm.  Sitting and standing bothered Plaintiff.  In fact, Plaintiff had begun experiencing pain shortly after the hearing began (Tr. 767-768).

During a typical day, Plaintiff got up between 8:00 A.M. and 9:00 A.M., ate breakfast and took his medication.   He then  tried to work around the house.  As therapy, he soaked in a warm bath three times weekly  (Tr. 769).

### B.      VE Testimony.

The VE testified at the June 2001 hearing that an individual  (1) unable to perform any job that demanded a closely regimented pace of production, (2) unable to concentrate on work, (3) required to work in a controlled atmosphere, (4) required to have a sit/stand option and (5) able to lift up to fifteen pounds occasionally, would not be able to return to Plaintiff's past relevant work (Tr. 774-775).  The work that would accommodate such limitations would be eroded in the 80-95% range of light work and 90 to 95% in the sedentary range (Tr. 776).  There would be 15,000 sedentary, unskilled jobs and 180,000 light, unskilled jobs.  The remaining non-eroded positions that would accommodate the individual's impairments would be primarily as a surveillance system monitor (Tr. 777).  If Plaintiff's testimony regarding  pain, periodic nausea resulting in regurgitation, the fatigue factor from sleep deprivation and the side effects of medication were all deemed credible limiting factors and would preclude the performance of available jobs listed by the VE (Tr. 780-781).

### 2.      The June 15, 2004, Hearing.

At the second hearing, Plaintiff was the sole witness as the VE was unable to appear due to a scheduling conflict.  Plaintiff testified that he continued to live with his second wife (Tr. 720).

Although Plaintiff could not specifically remember the consultation, Dr. Bauer diagnosed him with thoracic outlet syndrome.  He took prescribed pain medication and occasionally soaked in a hot tub or used a heating pad to relieve pain (Tr. 718,725).  Plaintiff was also diagnosed with myoclonus, a disorder characterized by brief involuntary muscle jerks or twitches occurring in his leg, arm or his entire body (Tr.

718-19, 723).  Plaintiff alluded to his ability to control the tremors if he concentrated (Tr. 724).  He was

taking Depakote to minimize jerks/twitches (Tr. 521-522, 718).  To relieve headaches, Plaintiff took

Tylenol, assumed a reclining position and avoided exposure to light (Tr. 727).  Plaintiff counseled with a

mental health professional on issues related to depression (Tr. 725, 726).

Plaintiff explained that his condition had deteriorated since the first hearing.  His  pain interfered

with his ability to sleep at night.  He tended, therefore, to sleep during the day.  He was uncertain whether

drowsiness was a side effect of his medication; however, he took pain medication in the morning and before

going to bed.  He admitted that the pain medication helped him fall asleep (Tr. 721).  He woke up during

the night; consequently, he slept up to four hours during the day (Tr. 722).  He estimated that during a

month, there were two days that he would remain in bed or sleep on the floor.  On those days, he

experienced pain and a lot of fatigue (Tr. 723).

Plaintiff owned two disabled vehicles–a 1990 Dodge Shadow and a 1984 Camaro.  He drove a 1989

F-Ford 150 (Tr. 719).  Plaintiff admitted that he accompanied his wife when she shopped for groceries.

Occasionally, he cooked a microwave meal.  In addition, Plaintiff took out the garbage and mowed the lawn

(Tr. 720).  He noted recently that it took him longer to mow the yard than it had in the past (Tr. 726).

Following the hearing,  ALJ Bernstein sent a vocational interrogatory including eight questions

based upon two hypothetical statements of residual functional capacity to VE Joseph Havranek.  The

hypothetical question posed to the VE presumed a claimant that was unable to lift and carry more than

twenty pounds occasionally and ten pounds frequently, unable to reach extreme postures or atmospheric

concentrations, unable to perform work in a closely regimented pace of production or under close and

critical supervision, and unable to work in an environment that imposes intense contact with the public or

strangers.  In his response dated July 26, 2004, the VE concluded that all Plaintiff's past work was unskilled

5

and that he is unable to perform any past work; however, the VE did identify sedentary and light jobs that

Plaintiff could perform such as hand mounter and microfilm document preparer.  There were 200 to 250

hand mounter jobs in the Toledo area and 800 to 1000 in the Ohio region.  There were 500 microfilm

document prepare positions in the Toledo area and 2000 in the Ohio region.  If the claimant were capable

of performing light work, there were 750 to 1000 laundry folder jobs that the claimant could perform in the

Toledo area.  There were 3000 to 4000 in the Ohio region (Tr. 405-406)

### III.  MEDICAL EVIDENCE

In 1995, Dr. Gretchen Tietjen, a neurologist, diagnosed Plaintiff with essential myoclonus (Tr. 628-

630).  On January 14, 1997, Dr. Michael Grillis, D. O., operated on Plaintiff to repair an incarcerated

umbilical hernia (Tr. 510-512).  From May 28 to May 30, 1997, Plaintiff was hospitalized for long-term

monitoring for epilepsy.  After observing myoclonic jerks, Plaintiff's physician prescribed Depakote, to be

taken at 500 mgs (morning and noon) and 750 mgs (evening) (Tr. 521-522).

In May 1998, Dr. Tietjen opined that Plaintiff's myoclonic jerks were doing much better while taking

medication, and Plaintiff indicated that he would like to return to work (Tr. 125-126).  On June 9, 1998,

Plaintiff underwent pulmonary tests which revealed evidence of moderately severe obstructive airway

disease (Tr. 523-526).  Plaintiff was involved in a motor vehicle accident on October 3, 1998, causing pain,

numbness and tingling in his back, arms and legs (Tr. 140, 168-69, 253-54, 413-14, 745).

Plaintiff underwent arthroscopic partial medial meniscectomy to repair the medical meniscus of his

right knee on April 26, 1999 (Tr. 158-59).  After the surgery, Plaintiff continued to experience pain in his

right knee (Tr. 156).  Despite the pain, on October 19, 1999, Dr. John Bondra, an orthopedic surgeon, found

no sign of instability and no clicking of the knee (Tr. 435).  In December 1999, Dr. Bondra indicated that

Plaintiff had some tenderness and minimal osteoarthritis changes in his knee (Tr. 150-51).  He opined that

Plaintiff had regained full range of motion, and his ability to sit, lift, and carry was not affected; while his ability to stand and walk was mildly affected (Tr. 151).  Dr. Norman Pennington found on August 23, 1999, that the results from the magnetic resonance imaging (MRI) were unremarkable with no abnormalities (Tr. 165).

Dr. William R. Bauer reported in January 2000, that Plaintiff had a weakened grip strength, reduced reflexes, and he tested positive for thoracic outlet syndrome ("Roos sign") (Tr. 161).  On January 31, 2000, Dr. T. T. Thatcher, a chiropractor, detailed Plaintiff's injuries and illnesses, noting that Plaintiff suffered a flexion-extension injury of the cervical, thoracic and lumber spine, and compression trauma to the intervertebral discs resulting in local hemorrhage and disc dehydration.  Dr. Thatcher noted that Plaintiff's symptoms were exacerbated by long periods of standing or sitting, bending, twisting, and reaching (Tr. 172).

From March to June 2000, Plaintiff underwent physical therapy for his fibromyalgia symptoms (Tr. 538-559).  An August 2000, MRI of the lumbar spine revealed mild disc bulging and thecal sac effacement at the L4-5 level and diffuse mild hypertrophic facet arthritis throughout the lumbar region (Tr. 562).

During a brief hospitalization following a second motor vehicle accident in September 2000, Plaintiff was diagnosed with cervical whiplash strain and exacerbation of lower back pain.  During treatment, Plaintiff complained that all of his pain from his prior accident had been exacerbated (Tr. 570-571).  The results from Plaintiff's cervical spine and pelvis X-ray were unremarkable (Tr. 569).

In November 2000, Robert Blue, a physical therapist (P.T.), recommended an in-home flexibility and therapeutic exercise program to treat Plaintiff's cervical, thoracic and lumber pain resulting from the motor vehicle accident (Tr. 446-448).  The quantitative somatosensory test administered in December 2000, revealed abnormality on the left, L4, and L5-S1 root distribution and in the arms and legs for lumbar root and plexus (Tr. 201-208).

7

On May 30, 2001, Dr. Thatcher noted that Plaintiff continued to report periodic headaches, pain, restricted motion in his neck and back, and insomnia (Tr. 216).  He further reaffirmed his opinion that Plaintiff was unable to perform any work activities and that any type of retraining would not be beneficial (Tr. 216-217).

A July 2, 2001, MRI of Plaintiff's left knee showed a tear of his posterior horn of the medial meniscus extending to the tibial articular surface (Tr. 615).  Plaintiff underwent an x-ray of his left shoulder on July 5, 2001, after complaining of pain resulting from the motor vehicle accident occurring in 2000.  The x-ray showed "degenerative arthritis AC joint with spurring and also spurring on the undersurface of the acromion and sclerosis on the greater tuberosity of the proximal humerus" (Tr. 484).  On July 11, 2001, Plaintiff underwent arthroscopic partial medial meniscectomy of the left knee (Tr. 635-637).  Plaintiff declined any physical therapy (Tr. 634).  An electromyography (EMG) administered in August 2001 confirmed earlier findings of thoracic outlet syndrome and bilateral L5-S1 acute and chronic lumbar radiculopathy (Tr. 656).

In July 2002, Dr. Bauer noted the continuation of Plaintiff's pain, sleep interruption and worsening depression (Tr. 646-647).  Once Plaintiff rated his pain at seven of ten on an ascending scale of severity, Dr. Bauer opined that Plaintiff was "a disaster with pain" (Tr. 506).  On February 23, 2004, Dr. Bauer opined that Plaintiff was disabled and unemployable (Tr. 711).  In June 2004, Dr. Bauer reiterated that Plaintiff was incapable of being gainfully employed at that time because of injuries to the central and peripheral nervous system as well as his psychiatric status (Tr. 713).

On January 20, 2003, Dr. Sushil E. Sethi, a general surgeon, performed a consultative physical examination and determined the following:  (1) Plaintiff had tenderness in his knees and ankles, but normal range of motion in all his joints; (2) Plaintiff was unable to walk on his heels or toes, but could squat and

8

had a normal gait; (3) results from a neurological exam were normal and (4) Plaintiff's ability to perform work-related activities, such as sitting, standing, walking, and handling might be slightly limited (Tr. 659-661).

At the request of the Social Security Administration, Dr. Darlene Barnes, Ph.D., evaluated the Plaintiff on January 22, 2003 and determined that Plaintiff, who spent most of his day sleeping: (1) was confused, (2) had difficulty thinking clearly, (3) had difficulty in processing information, (4) demonstrated a slow response, and (5) had problems with making appropriate decisions, decreased concentration, forgetfulness, lack of energy, depression, and fatigue. It was apparent to Dr. Barnes that Plaintiff appeared compromised with regard to his judgment and reasoning skills. She diagnosed Plaintiff with major depressive disorder, cognitive disorder and alcohol dependence in partial remission. She also found that Plaintiff's behavior was considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas (ex: stays in bed all day, no job, no home, no friends). Dr. Barnes opined that Plaintiff was moderately impaired in his ability to relate to others; understand, remember, and follow instructions; and maintain attention, concentration, persistence, and pace in order to perform simple, repetitive tasks. Finally, it was Dr. Barnes' opinion that Plaintiff was markedly impaired in his ability to withstand the stress and pressures associated with day-to-day work activity (Tr. 667-674).

Plaintiff was involved in a third motor vehicle accident in October 2004. Plaintiff complained that his prior medical conditions were exacerbated as a result of the accident. An examination of the Plaintiff showed tenderness in the neck, brachial plexus, thoracic outlet syndrome, paralumbar spasm, and altered reflex and sensation. Plaintiff was treated with an injection and adjustment in medication (Tr. 284).

Dr. Bauer increased Plaintiff's medication to the level of seizures in August 2005 (Tr. 283). On July

27, 2006, the examination showed no evidence of seizure.  The dosage of seizure medication was increased

and medication used to treat a depressive disorder was introduced into Plaintiff's treatment regimen (Tr.

282).

## IV.  STANDARD FOR DISABILITY

"The Commissioner's regulations governing the evaluation of disability for DIB and SSI are

identical…, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416. 920 respectively."  *Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a

"disability".  *Id.* (*citing* 42 U.S.C. § 423(a), *See also* (d); 20 C.F.R. § 416.920).  "Disability" is defined as

the "inability to engage in any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used

in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

To determine disability, the Commissioner has established a sequential evaluation process for

disability determinations.  20 C.F.R. § 404.1520 (a)(4) (Thomson Reuters 2009).

First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not

disabled.  20 C.F.R. §§ 404.1520 (a)(4)(i) and 416.920(a)(4)(i) (Thomson Reuters 2009).

Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner

determines if the claimant has a severe impairment or impairments; if not, the claimant is found not

disabled.  20 C.F.R. §§ 404.1520 (a)(4)(ii) and 416.920(a)(4)(ii) (Thomson Reuters 2009).

Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments.  If

the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and

benefits are awarded.  20 C.F.R. §§ 404.1520 (a)(4)(iii) and 416.920(a)(4)(iii) (Thomson Reuters 2009).

Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled.  20 C.F.R. §§ 404.1520 (a)(4)(iv) and 416.920(a)(4)(iv)(Thomson Reuters 2009).

Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform.  20 C.F.R. §§ 404.1520 (a)(4)(v) and 416.920(a)(4) (iv) (Thomson Reuters 2009).

## V.  ALJ DETERMINATIONS

After consideration of the entire record, the ALJ made the following findings:

1.    Plaintiff met the nondisability requirements for a period of disability and DIB as set forth in the Act, and was insured for benefits through December 31, 2004.

2.    Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability.

3.    Plaintiff had severe impairments of cognitive disorder, depressive disorder, personality disorder, essential myoclonus, fibromyalgia, asthma/emphysema, cervical strain status post multiple motor vehicle accidents, degenerative disc disease, arthritis, left shoulder impingement, history of torn medial meniscus status post repair, and brachial plexopathy/thoracic outlet syndrome.

4.    Plaintiff did not have an impairment that met or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    Plaintiff's allegations regarding his limitations were not totally credible, as set forth in the body of the decision.

6.    Plaintiff had the residual functional capacity to perform a restricted range of light work. Plaintiff could not lift more than 20 pounds occasionally and 10 pounds frequently, reach extreme postures (stooping, kneeling, bending, etc.) more often than occasionally.  Plaintiff could not work in atmospheric conditions of dust, smoke, and chemical fumes that would not be as comfortable as ordinary retail, commercial environments.  Plaintiff could not perform work that required a closely regimented pace of production.  Close regimentation

is a consequence of certain operational demands for a rapid pace or functioning within close tolerances. Close regimentation might be required when there is a high value placed on a product, the raw materials, the pace of production, or the equipment employed. Close and critical supervision in the context of close regimentation would produce unacceptable stress. This work is different from jobs that allow employees to determine the timing of different work activities or to determine the pace of work. Plaintiff is also unable to perform work that exposes him to intense contact with the public or strangers. Plaintiff's contact with the public or strangers would present emotional challenges. Customers with emergencies or extreme dissatisfaction could make Plaintiff uncomfortable.

7. Plaintiff was unable to perform any past relevant work; however, Plaintiff had the residual functional capacity to perform a significant range of light work.

.

8. Plaintiff, a "younger individual" between the ages of forty-five (45) and forty-nine (49), had a high school, or high school equivalent education and did not possess any transferable skills from any past relevant work and/or transferability of skills was not an issue in the case.

9. There were a significant number of jobs in the national economy that Plaintiff could perform. Light work includes laundry folder (3,000 to 4,000 positions in Ohio), photofinisher (800 to 1,000 positions), and microfilm document preparer (2,000 positions).

10. Plaintiff was not under a "disability" as defined by the Act, at any time through the date of this decision.

(Tr. 36-38).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383 (c)(3). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006). Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). The decision must be affirmed if the ALJ's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision. 'Substantial evidence' means 'more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept.'"  *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) (*citing Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2428 (1983) (*quoting Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).  Furthermore, the court must defer to an agency's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ."  *Id.* (*citing Key, supra*, 109 F.3d at 273).

## VII.  DISCUSSION

### I.    PLAINTIFF'S BRIEF

Plaintiff seeks reversal of the Commissioner's decision and presents the following arguments:  First, the ALJ failed to attribute greater weight to the opinions of treating physicians.  Second, the ALJ failed to comply with the Appeals Council's Order of Remand causing untimeliness and unfairness to Plaintiff.  Third, the ALJ failed to consider Plaintiff's mental impairments in combination with his physical impairments.  Fourth, the ALJ erred in finding that Plaintiff is capable of performing "light" work.  In his Reply, Plaintiff supplements the arguments presented in his Brief.

Defendant argues that the ALJ's conclusion that Plaintiff was not disabled is supported by substantial evidence and is legally sound since the Appeals Council subsequently denied Plaintiff's request for review.  Further, Defendant contends that the ALJ reasonably determined that Plaintiff's allegations regarding the extent of his limitations were not wholly credible and the ALJ reasonably weighed the medical evidence in concluding that Plaintiff retained the residual functional capacity to perform a range of light work.  Finally, Defendant argues that the ALJ appropriately considered Plaintiff's impairments in combination.

A.    **DID THE ALJ IMPROPERLY DISCOUNT THE OPINIONS OF PLAINTIFF'S TREATING AND EXAMINING PHYSICIANS?**

Plaintiff argues that the ALJ failed to address the factual foundation for his conclusions. Specifically, the ALJ should have given greater weight to Dr. Bauer and Dr. Thatcher's opinions because they are his treating physicians.

The opinions of treating physicians are entitled to greater weight than opinions from other medical sources, because of their greater opportunity to examine and observe the patient.  20 C.F.R. § 404.1527(d)(2) (Thomson Reuters 2009).  Nonetheless, the opinion of a treating physician is only given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and is "not inconsistent with other substantial evidence in your case record."  20 C.F.R. § 404.1527(d)(2) (Thomson Reuters 2009).

In this case, the ALJ acknowledged that Dr. Bauer was actively involved in the care of the Plaintiff and accepted him as a treating physician.  The ALJ disagreed with Dr. Bauer's opinion that Plaintiff was permanently disabled.  However, the ALJ clearly stated good reasons for disregarding Dr. Bauer's opinion. The ALJ explained that the notes of Dr. Bauer merely summarized Plaintiff's own self-accounts of his symptoms and contained minimal medical findings or examination results.  The ALJ determined that he provided little medical care other than providing refills of Plaintiff's medication.  The ALJ also explained that Dr. Bauer's assertion that Plaintiff was "permanently and totally disabled" was a conclusory assertion and was entitled no deference.  *See Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).  The ALJ also pointed to the consultative examination of Dr. Sethi, which contradicted the opinion of Dr. Bauer.

When addressing Dr. Thatcher's opinions, the ALJ explained that a chiropractor is not an acceptable medical source under the Act.  20 C.F.R. § 404.1513(a) (Thomson Reuters 2009).  The ALJ did not err in finding that Dr. Thatcher's assertions regarding vocational training were beyond his expertise.  The ALJ

14

is entitled to use the findings of chiropractors to show the severity of an impairment, but ultimately it is the

ALJ who determines disability.  20 C.F.R. § 404.1513(d)(1) (Thomson Reuters 2009).  The ALJ found in

accordance with Dr. Thatcher that Plaintiff suffered significant limitations from pain in his back, neck and

shoulders, but disagreed that there was substantial evidence to find that these limitations precluded Plaintiff

from all work.

The ALJ provided adequate reasons for the weight attributed to the opinions of Dr. Bauer and Dr.

Thatcher.

**2.      DID THE ALJ COMPLY WITH APPEALS COUNCIL ORDER OF REMAND?**

Plaintiff argues that the ALJ's decision should be reversed and the case remanded to the ALJ

because he failed to comply with the Appeals Council's remand order.  Specifically, the ALJ failed to:

(1)      assess the specific amount of time Plaintiff would be able to sit and stand during an eight-hour workday,

(2)      consider in detail the opinions of the state agency physicians who found that Plaintiff could sustain work activity requiring only simple instructions but needed a solitary work environment with minimal supervision and co-worker contact,

(3)      make a credibility determination consistent with 20 C. F. R. § 404.1529, SSR 96-4p, 96-7p and 96-9p, prior work record, precipitating and aggravating factors, treatment other than medication and other measures used to relieve symptoms,

(4)      pose a proper hypothetical question to the VE which confirmed the limitations in the established residual functional capacity and

(5)      proffer a letter to Plaintiff's attorney regarding the post-hearing psychological consultative examination which advises the attorney of his right to request a supplemental hearing (Tr. 313-314).

Federal courts are courts of limited jurisdiction, possessing only that power authorized by the

Constitution and statutes.  *Brown v. Commissioner of Social Security,* 2009 WL 465708, *5 (W. D. Mich.

2009) (*citing Kokkonen v. Guardian Life Ins. Co. of America,* 114 S. Ct. 1673, 1675 (1994); *In re Lewis*,

398 F.3d 735, 739 (6th Cir. 2005)).  Judicial appeals of Social Security decisions are authorized by 42

U.S.C. § 405(g), which provides in pertinent part:

> Any individual after any final decision of the Commissioner made after a hearing to which he was a party ... may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner may allow.

*Id.*

Section 405(g) "clearly limits judicial review to a particular type of agency action." *Id.* (*citing Califano v. Sanders,* 97 S. Ct. 980, 985 (1977)).  The regulations provide that a claimant must complete a four-step administrative review procedure to obtain a judicially reviewable final decision of a claim for benefits:  (1) initial determination; (2) reconsideration; (3) hearing before an administrative law judge; and, (4) Appeals Council review.  *Id.* (*citing* 20 C.F.R. §§ 404.900(a) (1)-(4); 416.1400(a)(1)-(4)).  When a claimant has completed these four steps, the agency "will have made [its] final decision" and the claimant "may request judicial review by filing an action in a Federal district court." *Id.* (*citing* 20 C. F. R. §§ 404.900(a)(5); 416.1400(a) (5)).  At step four, the Appeals Council review, the applicable regulations provide that "the administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." *Id.* (*citing* 20 C.F.R. § 416.1477(b)).  Whether an ALJ complies with an Appeals Council order of remand is an internal agency matter which arises prior to the issuance of the agency's final decision.  *Id.*  Section 405(g) does not provide federal court with authority to review intermediate agency decisions that occur during the administrative review process.  *Id.* (*citing Bass v. Astrue,* 2008 WL 3413299 at *4 (M. D. N. C. Aug.8, 2008)).  The Court's review is limited to whether the Commissioner applied the correct legal standards and whether the Commissioner's findings are supported by substantial evidence.  *Dishman v. Astrue*, 2009 WL 2823653 at *11 (E. D. Tenn. 2009).

The Magistrate is not authorized to review internal agency proceedings and therefore will not address, for lack of jurisdiction, whether the ALJ's February 2, 2006 decision is in compliance with the Appeals Council's order of remand.

**3.    DID THE ALJ APPROPRIATELY CONSIDER THE CUMULATIVE EFFECTS OF PLAINTIFF'S MENTAL AND PHYSICAL IMPAIRMENTS IN MAKING HIS DISABILITY DECISION?**

The Act requires the Commissioner to consider the combined effects of impairments that may be, individually, nonsevere, but which, in combination, may constitute a medically severe impairment or otherwise evince a claimant's disability.  *Saine v. Commissioner of Social Sec*., 2009 WL 891768, *11 (S. D. Ohio 2009) (*citing* 42 U.S.C. § 423(d)(2)(C); *Foster v. Bowen,* 853 F.2d 483, 490 (6th Cir. 1988)).  The United States Court of Appeals for the Sixth Circuit has held that "an ALJ's individual discussion of multiple impairments does not imply that he or she failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet the listings."  *Id.* (*citing Loy v. Secretary of Health & Human Servs*., 901 F.2d 1306, 1310 (6th Cir.1990) (*citing Gooch v. Secretary of H.H.S.,* 833 F.2d 589 (6th Cir.1987)).

Here, the ALJ specifically stated that he considered Plaintiff's impairments singly and in combination (Tr. 28).  Plaintiff failed to present evidence to rebut the ALJ's statements.

**4.    DID THE ALJ ERR IN FINDING THAT PLAINTIFF IS CAPABLE OF PERFORMING LIGHT WORK?**

Plaintiff argues that the ALJ's finding that he can perform light work is not supported by the substantial weight of the evidence.

In 20 C. F. R. § 404.1567(b), light work is defined:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when

17

it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

The ALJ failed to address whether Plaintiff had the ability to walk, stand or sit in either the interrogatories posed to the VE or his decision.  There is no indication in the ALJ's assessment of residual functional capacity that Plaintiff can substantially comply with all of the requirements of light or sedentary work.  On remand, the ALJ must properly consider all of Plaintiff's physical exertional requirements and whether Plaintiff can perform light or sedentary work given his limitations, if any, in his ability to walk, stand or sit.

## VIV.  CONCLUSION

Pursuant to sentence four of 42 U. S. C. § 405(g), this case is remanded to the Commissioner to determine if Plaintiff has the residual functional capacity to perform light or sedentary work and then redetermine whether Plaintiff is entitled to a period of disability and DIB and to determine whether Plaintiff is eligible for SSI.

**IT IS SO ORDERED**.

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Date: September 29, 2009